CONTINENTAL MOTORS CORPORATION v.
TOWNSHIP OF MUSKEGON.

1. CORPORATIONS—DISSOLUTION OF SUBSIDIARY.
   A parent corporation became subject to the obligations of its
   subsidiary upon dissolution of the latter and assumption of
   its position as lessee of government land.

2. TAXATION—RECONSTRUCTION FINANCE CORPORATION—WAIVER OF
   IMMUNITY—HARDSHIP.
   Provision of statute making real estate held by the Reconstruc-
   tion Finance Corporation, a creature of the Federal govern-
   ment, subject to local taxation was intended to prevent preju-
   dice to local economic conditions as the removal of property
   from tax rolls may result in hardship (47 Stat 9).

3. SAME—WAIVER OF IMMUNITY—SURPLUS PROPERTY—TITLE.
   The act of declaring property owned by the United States
   surplus *held*, not to have operated to change the general
   purpose or character of its use nor to terminate the waiver of
   immunity from local taxation at the time of such declaration,
   where the property continued to be occupied by the same lessee
   corporation which carried on the same operations deemed es-
   sential to the public welfare and title remained in the Re-
   construction Finance Corporation (47 Stat 9).

4. STATUTES—CONGRESS.
   Express legislation of congress in respect to a given matter
   must control in the absence of subsequent legislation equally
   express, and it is not to be overthrown by any mere inferences
   or implications to be found in such subsequent legislation,
   especially when it appears that congress, in some cases, has
   made express provision for effecting a change.

5. TAXATION—UNITED STATES—SURPLUS PROPERTY ACT.
   The surplus property act of 1944 did not manifest an intent by
   congress to automatically terminate a waiver of immunity

from local taxation of property owned by an agency of the United States theretofore subject to such taxation, where there was no change in title, ownership or in actual use or occupancy by the lessee.

6. SAME—UNITED STATES—WAIVER OF IMMUNITY—REVOCATION.

A congressional waiver of immunity of property, belonging to the United States, from local taxation may not be revoked by mere implication.

7. STATUTES—INTENT—TIME.

The intention of congress in the enactment of an earlier statute may not properly be determined by reference to a statute enacted several years later.

Appeal from Muskegon; Smith (Raymond L.), J., presiding. Submitted April 4, 1956. (Docket No. 18, Calendar No. 46,678.) Decided June 4, 1956.

Action by Continental Motors Corporation, a Virginia corporation, against Township of Muskegon, a constitutional body corporate, to recover taxes paid under protest. Orchard View Rural Agricultural School District No. 5, Muskegon Township, and County of Muskegon intervene as parties defendant. United States of America intervenes as party plaintiff. Judgment for defendants. Plaintiffs appeal. Affirmed.

*Butzel, Eaman, Long, Gust & Kennedy (Victor W. Klein* and *Clifford W. Van Blarcom,* of counsel) and *Joseph T. Riley,* for plaintiff Continental Motors Corporation.

*Charles K. Rice,* Acting Assistant Attorney General, *Lyle M. Turner,* Attorney in Department of Justice, *Wendell A. Miles,* United States Attorney, and *Robert J. Danhof,* Assistant United States Attorney, for intervening plaintiff United States of America.

*Charles A. Larnard,* for defendant Muskegon Township.

*Robert A. Cavanaugh,* for intervening defendant Muskegon County.

*Street & Sorensen (Harold M. Street,* of counsel), for intervening defendant Orchard View Rural Agricultural School District.

CARR, J.  This case involves the validity of the 1953 assessment, under the general property tax law* of Michigan, of certain real estate in defendant township.  The facts are not in dispute.  In 1943 one of the parcels of land assessed was conveyed to Defense Plant Corporation, a subsidiary of the Reconstruction Finance Corporation, and in 1945 like conveyance of the second parcel was made.  The grantor named in each conveyance was Continental Aviation and Engineering Corporation, a subsidiary of the plaintiff Continental Motors Corporation. Buildings for certain manufacturing purposes were constructed on the property, and subsequently enlarged, the necessary funds therefor being furnished by the Reconstruction Finance Corporation, hereinafter referred to as the RFC.

Said real estate was thereafter for a number of years assessed for taxes by the defendant township, and payment thereof was made each year prior to 1952.  During such period it does not appear that any question was raised as to the validity of the assessments, the legal title being in the RFC.  Section 10 of the act creating the latter corporation, passed by congress in 1932 (47 Stat 9),† provided for the exemption from taxation of various types of

---

* CL 1948, § 211.1 *et seq.,* as amended (Stat Ann 1950 Rev and Stat Ann 1955 Cum Supp § 7.1 *et seq.*).
† See 15 USCA, § 607.—REPORTER.

obligations that might be issued thereby and also of its capital reserves and surpluses. The following provision was then incorporated in said section:

"Any real property of the corporation shall be subject to State, territorial, county, municipal, or local taxation to the same extent according to its value as other real property is taxed."

Defense Plant Corporation was dissolved in 1945 and RFC, by virtue of congressional action, assumed actual control of the property. It is conceded that at such time, and during the prior years following conveyances to Defense Plant Corporation, the property was subject to taxation by virtue of congressional action.

In 1946, acting pursuant to the surplus property act of 1944 (58 Stat 765),* the RFC declared the plant in question to be surplus property, and undertook to surrender its possession and control, and accountability therefor, to the war assets administration. Acceptance of such custody and control was made June 1, 1948. There was no conveyance of the legal title to the last-named governmental agency.

Prior to the conveyance of the property to Defense Plant Corporation a lease was executed by said grantee to the Continental Aviation and Engineering Corporation. It appears that subsequently the latter company, a subsidiary of the Continental Motors Corporation, was dissolved and the property was thereafter occupied and used by the parent corporation. Such use and occupancy has continued to the present time. The record does not indicate that any material change in operations has taken place. A so-called agreement of lease, executed as of the 9th of June, 1942, between Defense Plant Corporation and Continental Aviation required the lat-

---

* See notes, 50 USCA App, § 1611 *et seq.*—REPORTER.

ter as lessee to pay "all taxes, assessments, and similar charges which at any time during the term of this lease may lawfully be taxed, assessed or imposed upon Defense Corporation or lessee with respect to or upon the site, the buildings, or the machinery, or any part thereof, or upon the occupier thereof or upon the use of the site, buildings or machinery." On the dissolution of Continental Aviation, its parent company, Continental Motors, assumed the position of lessee and thus became subject to the obligations imposed thereon.

Following the declaration that the property was surplus, and the acceptance of custody thereof by war assets administration, the RFC acting "by and through the war assets administrator," entered into a lease, as of April 1, 1949, in which it was designated as the "lessor" and Continental Motors Corporation as the "lessee." References were made therein to a contract between the United States government and the lessee providing for the manufacture of certain materials for the government, and covering the operation of the plant. Continental agreed in the lease to "pay to the properly constituted authority or authorities, as and when same may become due and payable all taxes, assessments, excises and similar charges which at any time during the term of this lease may be taxed, assessed or imposed upon lessor or lessee with respect to or upon the demised property or any part thereof, upon the occupier or operator thereof or upon the use or operation of the demised property."

Said lease purported to be for a 5-year period, but was subsequently surrendered as of November 1, 1950. At the time this action was taken custody and control of the plant had been transferred to general services administration. The instrument by which the lease was surrendered by RFC recited that it was "acting by and through the administrator of

general services." Consent to such surrender was executed by Continental Motors on June 30, 1952, and by RFC on August 13th of the same year. Prior thereto the RFC acting through the general services administrator issued a so-called "interim permit" to the ordnance corps of the army, authorizing the latter to occupy and use the property in question, referred to as Plancor 166-M and also designated as the "facility," for the carrying out of its purposes. In accordance with the plan of previous leases the ordnance corps agreed to "pay all taxes which may be levied and assessed against the facility while this permit shall be in full force and effect." The ordnance corps also assumed the obligation of introducing or causing to be introduced in congress legislation providing for the vesting of title to the facility in the United States of America. Under date of May 6, 1953, the RFC as grantor executed to the United States as grantee a deed of the property in question. Such conveyance, being subsequent to the 1st of January of said year, which date was fixed by statute as "tax day" (CL 1948, § 211.2, as amended by PA 1949, No 285 [CLS 1954, § 211.2, Stat Ann 1950 Rev § 7.2]), does not affect the present controversy.

The property was assessed for 1953 under the general property tax law of the State to the war assets administration and Continental Motors, and/or occupant. The amount of the assessment, together with interest and collection charges, in the sum of $143,630.27 was paid under protest by Continental Motors on February 26, 1954. The present action was brought to recover said amount, on the theory that the property was exempt from taxation and that, in consequence, the assessments against it were invalid. Pursuant to orders of the trial court the United States was permitted to intervene as a party plaintiff and the county of Muskegon and

Orchard View Rural Agricultural School District No. 5 as defendants.

The proofs on the trial in circuit court consisted of exhibits, many of which were received over objections. The trial judge, hearing the matter without a jury, determined the issue in favor of the defendants and judgment was entered accordingly. Plaintiffs have appealed, contending that on the 1st of January, 1953, the property in question belonged to the United States and was immune from taxation by local authorities. Defendants rely on the claim that on the date in question the RFC was the owner of the property, that the status thereof with reference to taxation was not changed by the transfer of custody, care and accountability, to the war assets administration, effective as of June 1, 1948, and that, in consequence, it was subject to taxation in defendant township for the year 1953 in accordance with the provisions of the general property tax law of this State.

Plaintiffs herein rest their case primarily on the decision of the court of claims of the United States in *Board of County Com'rs of Sedgwick County, Kansas* v. *United States,* 105 F Supp 995, decided July 15, 1952. Said case involved claimed immunity from taxation of certain property owned by the RFC in Sedgwick county, Kansas, and leased to the Boeing Airplane Company. The suit was brought to recover taxes assessed on said property for the years 1944 to 1947, inclusive. In August, 1946, the property was declared surplus under the surplus property act of 1944, above cited. Acceptance by the war assets administration was made on April 16, 1947. Because of the provisions of the Kansas statutes relating to the collection of taxes, it was deemed necessary to make specific provision for a judicial determination of the right of the county to levy the assessments for the years in question. Ac-

cordingly the congress by Public Law No 5, 82d Congress, 1st Sess (65 Stat 5), conferred jurisdiction on the court of claims. It was determined by said court that liability for the first 3 years of the period existed, and that the plaintiff was entitled to judgment accordingly, but that the acceptance of the property by the war assets administration in April, 1947, rendered invalid the tax for that year on the ground that following such acceptance the RFC, while owning the legal title, did not have physical possession, control, or custody of the property, nor the right to use it. The position taken with reference to the 1947 tax is summarized in the following excerpt from the opinion (pp 1001, 1002):

"There is no indication that congress intended to waive immunity from taxation under these circumstances, if indeed the Kansas legislature intended to tax the RFC's interest in such a situation. *Cf., Lancy v. City of Boston,* 186 Mass 128 (71 NE 302). Such a situation could not even have arisen at the time the waiver provision was enacted, and was made possible only by the enactment of the surplus property act some 12 years later. The purpose of the waiver provision had been fully served when the property passed to the control of the WAA.

"Upon consideration of these factors we cannot presume that congress intended the waiver provision with respect to 'real property of the corporation' to extend to the lands in question after they passed to the responsibility and authority of the WAA on April 16, 1947. Thus we hold that the cloak of immunity descended upon the property on that day and no tax liability for the property could arise thereafter."

In the case at bar it is not claimed that the property occupied and used by Continental Motors was immune from taxation from the time it was conveyed to the subsidiary of the RFC until its custody,

control, and accountability therefor were assumed by the war assets administration on June 1, 1948, by act of the administrator thereof. Plaintiffs insist, in line with the holding of the court in the *Sedgwick Case,* that thereafter the RFC held merely a barren legal title to the property, that the beneficial interest was in the United States, and that the waiver of the right to claim immunity from taxation, contained in the act of congress creating the RFC, was impliedly terminated. It may be argued with at least some measure of plausibility that the RFC was merely a creature of the Federal government, created for the benefit and protection of the public interest and welfare. Unquestionably the provision of the statute making real estate held by it subject to local taxation was intended to prevent prejudice to local economic conditions. It is doubtless true that the removal of property from tax rolls may, in many instances at least, result in hardship. It may well prove embarrassing to the functioning of local governments, and result in throwing a heavy burden on taxpayers generally.

The waiver of immunity from taxation in the act creating the RFC is significant in that it involved a recognition by congress that without such waiver the property would be exempt and, further, that for the public good it should be subject to local taxation. We are not in accord with the conclusion of the court of claims in the *Sedgwick County Case* (p 1002) that the "purpose of the waiver provision had been fully served" when property owned by the RFC was transferred to the control of the war assets administration. In any event such was not the situation in the case at bar. The RFC and the war assets administration were agencies of the Federal government, through which acts deemed essential to the public welfare were accomplished. Declaring the property in question to be surplus did not operate

to change the general purpose or character of its use. It continued to be occupied by Continental Motors as lessee, and that corporation continued to carry out the operations indicated by the agreements made by it with the Federal government through the latter's agencies. No reason is apparent why the waiver of immunity should have been terminated at that time. From the standpoint of local economy and well-being precisely the same reasons existed as during the prior years when it was assessed under the State law and taxes were paid without question.

It may be assumed that in the enactment of the surplus property act congress had in mind the status of real estate belonging to the RFC. It is somewhat significant in this connection that in 1948 congress extended the scope of the original waiver in such manner as to subject real property of the RFC to special assessments for local improvements (62 Stat 261).* Such action indicated a recognition of the fact that the reasons prompting the original waiver of immunity from taxation as set out in the act of 1932, creating the RFC, still obtained. The record in the instant case fully justifies the conclusion that the sudden removal from the tax rolls of property previously subject to taxation may well result in conditions that the waiver of immunity from taxation was designed to prevent.

As noted, it is claimed by plaintiffs that following the transfer of the plant, occupied and used by Continental Motors, to the war assets administration, the RFC had, in practical effect, no further interest therein. However, acting through the administrator of the WAA it assumed to enter into a lease with Continental Motors for a 5-year period. This was followed by the so-called interim permit to the army ordnance corps in which RFC acted

---

* See 15 USCA, § 607.—REPORTER.

through the general services administration. Likewise, as lessor, it made the agreement for the cancellation and surrender of the lease of April 1, 1949. These acts took place after the property was accepted as surplus, and indicate that the governmental agencies involved in these transactions did not then consider that the RFC had at the time no actual interest in the property. The fact remains that it assumed to act, and did act, as owner of the Continental Motors plant. The action of the agency in executing a conveyance of the property to the United States in 1953 is also significant.

In the final analysis the question at issue is whether congress clearly manifested an intent, in the enactment of the surplus property act of 1944, or otherwise, that property of the RFC, declared surplus without a transfer of the legal title, should thereupon become immune from taxation, notwithstanding the waiver in the act creating said corporation. The determination of such question may not rest in conjecture, supposition, or presumption. May it be said to appear that congress intended that the waiver of immunity should end with the acceptance of property subject to such waiver by another governmental agency assuming responsibility for its care, custody and accountability, but not vested with the title? We think it may properly be assumed that had the congress so intended it would have spoken in clear and unequivocal language. In determining this question consideration may properly be given, as above suggested, to the fact that the occupancy of the property here involved did not change and that the character of the purposes for which it was used was not altered. The agreements between Continental Motors, as occupant, and the government, through its agencies, clearly indicated a continuing situation.

The general principle recognized by the supreme court of the United States in *Rosencrans* v. *United States,* 165 US 257, 262 (17 S Ct 302, 41 L ed 708), may well be applied under the factual situation presented here. It was there said:

"In other words, where congress has expressly legislated in respect to a given matter that express legislation must control, in the absence of subsequent legislation equally express, and is not overthrown by any mere inferences or implications to be found in such subsequent legislation. Especially is this rule to control when it appears that congress in some cases has made express provision for effecting a change."

By analogy, the opinion in *Reconstruction Finance Corporation* v. *Beaver County,* 328 US 204 (66 S Ct 992, 90 L ed 1172), suggests the general policy of congress with reference to matters affecting taxation of property by local governmental units. Likewise, in *Federal Trade Commission* v. *Bunte Brothers, Inc.,* 312 US 349, 351 (61 S Ct 580, 85 L ed 881), it was said:

"But bearing in mind that in ascertaining the scope of congressional legislation a due regard for a proper adjustment of the local and national interests in our Federal scheme must always be in the background, we ought not to find in section 5* radiations beyond the obvious meaning of language unless otherwise the purpose of the act would be defeated. *Minnesota Rate Cases,* 230 US 352, 398–412 (33 S Ct 729, 57 L ed 1511, 48 LRA NS 1151, Ann Cas 1916A, 18)."

The general principles recognized in these and other decisions may well be considered in determining the interpretation to be placed on the sur-

---

* Reference is to section 5 of Federal trade commission act, 38 Stat 719, as amended, 15 USCA, § 45.—REPORTER.

plus property act of 1944. We are not persuaded that congress manifested therein any intent that the transfer of real estate from one public agency to another, without a change in title and ownership, or in actual use and occupancy by the lessee, should automatically terminate a waiver of immunity from taxation as to such property.

In addition to the *Sedgwick County Case, supra,* counsel for plaintiffs rely on other decisions, none of which involved a dispute of the character presented in the instant case. In *United States* v. *County of Allegheny,* 322 US 174 (64 S Ct 908, 88 L ed 1209), the question at issue was the right to tax under State law property belonging to the government of the United States and as to which immunity from taxation had never been waived. In *S.R.A., Inc.,* v. *Minnesota,* 327 US 558 (66 S Ct 749, 90 L ed 851), State authorities sought to tax land that in previous years had been conveyed to the United States as a site for a post office and other Federal offices and agencies. The property was eventually vacated by the government and was sold under an act of congress authorizing such action. The purchaser took possession, with right of user, under a contract of sale which provided for retention of the legal title by the government for purposes of security until the amount of the purchase price had been paid in full. The assessment was made subject to the title remaining in the United States. Under the circumstances it was held that the tax was valid.

*United States* v. *Shofner Iron & Steel Works* (CCA), 168 F2d 286, did not involve the taxation of property. It was an action by the United States government to recover possession of real property located in the State of Oregon which had been taken over by RFC on the dissolution of Defense Plant Corporation in 1945. The question was

whether the United States was the real party in interest. The appellate court pointed out that the RFC was a wholly-owned agency of the government, and that it held legal title for the use of the United States and subject to the authority of the latter in its disposition. As in the case at bar, said property had been declared surplus under the act of congress of 1944. The right to maintain the possessory action was sustained.

In *Johns Hopkins University* v. *Board of County Commissioners of Montgomery County,* 185 Md 614 (45 A2d 747), it was held that property acquired by the plaintiff university under contract with the United States for the purpose of erecting a research plant for the government, plaintiff being bound by contract to convey the property to the government or to a grantee designated by it, was immune from State taxation because of the Federal government's interest therein. In this case, as in other cases above noted, there was involved no express waiver by congress of immunity from taxation by local governmental units, or the implied termination or withdrawal of such waiver.

Plaintiffs also direct attention to the fact that congress, in 1955, by Public Law No 388, chapter 874 (69 Stat 721),* retroactive in effect as of January 1, 1955, sought to afford relief to certain municipalities economically affected by the removal from the assessment rolls of property previously subject to taxation. Apparently such action is claimed to indicate the interpretation that should be placed on the surplus property act adopted by congress in 1944. However, the intention of congress in the enactment of the earlier statute may not properly be determined by reference to a subsequent act passed several years later. The report submitted with said measure

---

* See 40 USCA 1955 Supp § 521 *et seq.*—Reporter.

clearly indicated the feeling on the part of the committee that the decision in the *Sedgwick County Case,* and the subsequent action of certain governmental agencies and departments following such decision, rendered expedient and desirable action of the character suggested, namely, the relief of local municipalities. We do not think that this action, as explained by the report (US Code Congressional and Administrative News, 84th Congress, First Session, 1955, p 3114 *et seq.*), or prior legislation of a similar character, may be regarded as establishing that congress intended real estate expressly subjected to local taxation by virtue of the act creating the RFC should acquire immunity by a mere transfer of possession, custody and accountability, to another Federal agency. Furthermore, the legislation to which plaintiffs direct attention indicates conclusively a general purpose on the part of the congress to protect the economy of local municipalities and to prevent the placing of undue hardships thereon. Such purpose is at variance with the claim that in the adoption of the surplus property act it was intended to terminate the waiver of immunity from taxation with which we are here concerned.

The waiver of immunity from taxation involved in the instant case came into being by express action of congress. It is, we think, inconceivable that that body contemplated the revocation of such waiver by mere implication. The matter was one of prime importance economically to the government of the United States and to local governments as well. Had congress intended the result claimed by plaintiffs in the present case, and held by the court of claims in the *Sedgwick Case, supra,* we believe that it would have spoken accordingly in clear and unequivocal terms. In the absence of an expression of such intent it is our conclusion that the taxes in question here were properly assessed. The factual situation

does not require, or permit, a finding that the waiver of immunity from taxation was impliedly withdrawn by the enactment of the surplus property act.

The trial court was not in error in entering judgment in favor of the defendants. That judgment is affirmed.

DETHMERS, C. J., and SHARPE, SMITH, BOYLES, KELLY, and BLACK, JJ., concurred.

The late Justice REID took no part in the decision of this case.